UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE MORELLO,<br><br>  Plaintiff,<br><br>  v.<br><br>AMCO INSURANCE COMPANY,<br><br>  Defendant. | Case No. 11-cv-06623-WHO<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 101, 102 |

## INTRODUCTION

Plaintiff George Morello, who is quadriplegic, was hit by a drunk driver while crossing a street in his wheelchair. He filed an underinsured motorist claim with his insurance company, defendant AMCO Insurance Company. He alleges that AMCO handled his underinsured motorist claim in bad faith because it unreasonably determined that any future medical care he required was due to his pre-existing quadriplegia, rather than the accident. Because I find that AMCO reasonably investigated Morello's claim, including appropriately taking into account Morello's quadriplegia, I GRANT AMCO's motion for summary judgment and DENY Morello's cross-motion for summary judgment.

## BACKGROUND

### I.   FACTUAL BACKGROUND

On March 26, 2008, Morello was hit by a drunk driver while crossing a street in his motorized wheelchair. He was transported by ambulance to the Stanford University Medical Center. An emergency medical technician prepared a pre-hospital care report stating that Morello was "conscious, alert and oriented" and that the technician did not observe any trauma. Anderson Decl. Ex. C, p. 72. He was released from the hospital the following day with a diagnosis of three fractured ribs and a left adrenal lesion. Anderson Decl. Ex. D, p. 75. His condition on discharge was "good." *Id*.

Gene Drakulich, Morello's attorney at the time (and his brother-in-law) reported the

accident to AMCO on April 3, 2008.  On April 4, 2008, AMCO claim representative, Lula Weng, spoke to Drakulich over the phone and stated that she would like to meet with Morello.  Cohen Decl. Ex. F, p. 112 (Weng Depo. Ex. 7).  Drakulich stated that he would try to arrange a meeting over the following two weeks.  *Id.*  On April 7, 2008, Weng sent a letter to Drakulich, reiterating that she wanted to meet with Morello.  Cohen Decl. Ex. F, p. 120 (Weng Depo. Ex. 8).  She asked Drakulich to contact her to set up an appointment.  *Id.*  On April 9, 2008, Weng faxed requests for medical authorizations to Drakulich.  Cohen Decl. Ex. F, p. 122 (Weng Depo. Ex. 9).

Drakulich informed Weng on April 30, 2008 that he would likely not be representing Morello.  Cohen Decl. Ex. F, pp. 98-100 (Weng Depo. 24:23-26:15).  On May 16, June 5, June 30, July 23, August 22, and September 18, 2008, Weng called Drakulich for status updates and to ask who would be representing Morello.  Cohen Decl. Ex. F pp. 113-15 (Weng Depo. Ex. 7).  Weng faxed a letter to Drakulich on October 30, 2008, writing, "I have been calling on several occasions requesting a copy of the designation letter along with scheduling a time to meet with your client George Morello Jr. and yourself."  Cohen Decl. Ex. G, p. 147 (Drakulich Depo. Ex. 29).

On November 18, 2008, Drakulich faxed Weng a letter stating that Drakulich was no longer representing Morello and Simoncini & Associates notified Weng that it was representing Morello.  Cohen Decl. Ex. G. pg. 151 (Drakulich Depo. Ex. 30) and Ex. F, p. 117 (Weng Depo. Ex. 7).  The same day, Weng responded to Simoncini & Associates by letter and identified what AMCO required to process Morello's claim, including medical reports and medical bills, and stated that AMCO was entitled to an "in-person statement" from Morello "regarding the facts of the accident, the nature and extent of his injuries."  Cohen Decl. Ex H, p. 161 (McDonald Depo. Ex. 40).

AMCO transferred the handling of the claim from Weng to Casualty Claims Specialist Brad Baumann on November 21, 2008.  Cohen Decl. Ex. E, p. 6 (Baumann Depo. 81:22-25).  That day, Baumann faxed a letter to Simoncini & Associates requesting the current status of Morello's injury and treatment.   Baumann also forwarded another medical records authorization form to Simoncini & Associates and requested that Morello execute it.  Cohen Decl. Ex. E p. 39 (Baumann Depo. Ex. 5).  Simoncini & Associates replied by fax on December 15, 2008, stating

2

that it was "in the process of gathering the medical records, billing statements, and documents regarding the property damage." Cohen Decl. Ex. E, p. 43 (Baumann Depo. Ex. 6). It also informed AMCO that Morello had filed suit against Melvin Sandorff, the driver who hit Morello, and that Sandorff's policy limit of $15,000 was insufficient to compensate Morello's for his damages. *Id*.

Four months later, on April 15, 2009, Simoncini & Associates faxed Baumann a letter advising that Sandorff's insurance company, Mercury, had offered to settle Morello's claim for the policy limits of $15,000. Cohen Decl. Ex. E, p. 52 (Baumann Depo. Ex. 8). It also stated that it was "still in the process of gathering the medical records, billing statements, and documents regarding the property damage." Cohen Decl. Ex. E, p. 52 (Baumann Depo. Ex. 8). Baumann responded by fax the day he received the letter, stating that in order to make an uninsured motorist claim, Morello needed to provide AMCO with a copy of the release from Mercury, proof of its liability limits, and "all of the pertinent medical records and itemized medical billings pertaining to Mr. Morello's injury." Cohen Decl. Ex. E, p. 54 (Baumann Depo. Ex. 9).

Six months passed before Simoncini & Associates faxed AMCO the requested release from Mercury and proof of liability limits. Cohen Decl. Ex. E, p. 56 (Baumann Depo. Ex. 10). An accompanying letter said that Simoncini & Associates "will be forwarding to you under separate cover copies of all pertinent records including medical records regarding Mr. Morello's injuries." *Id*. The letter also read, "We hereby demand that the matter proceed to arbitration." *Id*.

On November 11, 2009, Simoncini & Associates told AMCO that it was preparing a settlement demand. Cohen Decl. Ex. E, p. 18 (Baumann Depo. 129:15-21). AMCO received it on March 4, 2010. Morello demanded the policy limits of $500,000 plus $5,000 medical pay, which included $209,000 to $297,000 in future medical expenses. Cohen Decl. Ex. E, p. 61 (Baumann Depo. Ex. 11).

Baumann evaluated Morello's demand on March 12, 2010. He noted in his Claim Activity Log that Morello claimed $315,784 in "future medical specials." Baumann wrote "not allowing" next to this figure. Coke Decl. Ex. H (GMORELLO 02161). Baumann also discussed his evaluation with superiors. As a result of that discussion, AMCO decided to have Morello's

3

1 records reviewed by a Claims Medical Specialist, Sharon Powell, a registered nurse who reviews
2 medical records for claims adjusters. Cohen Decl. Ex. E, pp. 22-23 (Baumann Depo. 156:24-
3 157:8). Powell has prior experience with quadriplegic patients and patients with spinal injuries.
4 Cohen Decl. Ex. I, pp. 168-69, 173-74 (Powell Depo. 22:3-15, 27:15-17, 59:24-60:2).

5      After Powell reviewed Morello's available medical records, she submitted a report on
6 March 19, 2010. Cohen Decl. Ex. I, pp. 177-180 (Powell Depo. Ex. 3). She identified the specific
7 reasons for referral from Baumann as:

> Injuries of concern: prior quadriplegic; cou1d this loss have caused pain from broken ribs, thoracic/lumbar sprain/strain, etc. also would he require the future care his attorney is alleging?

10 *Id*. at 177. Regarding Morello's future care, Powell concluded that he "would have needed the
11 same care he had prior to this loss with or without it." *Id*. at 179. Powell noted that "[i]t would be
12 important to know his Asia Impairment Scale (classification of how severe cord injuries are).
13 Some [presumably, cord injuries] are complete and some incomplete (these would allow more
14 function of course)." *Id*. at 180. She also recommended that Baumann consider requesting
15 additional medical records from Morello, including prior primary care and neurosurgeon records
16 and Morello's current treatment records. *Id*.

17      On April 2, 2010, Baumann faxed a letter to Simoncini & Associates stating that, at that
18 time, AMCO was "unable to accept or reject your demand as we need additional documentation."
19 Cohen Decl. Ex. E, p. 74 (Baumann Depo. Ex. 13). Baumann's letter also asked Simoncini &
20 Associates to identity the medical providers Morello had seen for the five years preceding the
21 accident and to provide supporting documentation for his claim of future medical care. The letter
22 stated that AMCO would have Morello undergo a neurological independent medical examination
23 once AMCO received the requested medical records. Enclosed was another medical authorization
24 for Morello to complete. *Id*.

25      Three months later, on July 1, 2010, Simoncini & Associates faxed Baumann the medical
26 records authorization signed by Morello and the disclosures of the medical providers Morello had
27 seen prior to and since the accident. Cohen Decl. Ex. E, p. 82 (Baumann Depo. Ex. 16). The
28 same day that Baumann received the signed medical records authorization, he submitted an order

to receive Morello's medical records. Cohen Decl. Ex. E, p. 33 (Baumann Depo. 182:3-17); Anderson Decl. ¶ 7, Exs. C, D. AMCO received responses from Morello's medical providers by September 8, 2010. Cohen Decl. Ex. E, p. 34 (Baumann Depo. 188:3-6); Anderson Decl. ¶ 7.

On October 21, 2010, Baumann faxed a letter to Simoncini & Associates stating that he was in the process of setting up an independent medical examination for Morello with a neurologist and asking for possible dates over the next few months. Cohen Decl. Ex. E, p. 88 (Baumann Depo. Ex. 17). Simoncini & Associates apparently did not respond. Two months later, on December 10, 2010, claims representative Gina Milone, to whom Morello's claim had been reassigned, mailed Simoncini & Associates a letter asking for Morello's availability for the independent medical examination. Cohen Decl. Ex. J, p. 199 (Milone Depo. Ex. 16). On January 14, 2011, Milone advised Simoncini & Associates that the independent medical examination had been scheduled for January 25, 2011. Cohen Decl. Ex. J, p. 202 (Milone Depo. Ex. 19).

Dr. James Soong, a neurologist who specializes in spinal injuries, reviewed Morello's medical records and conducted a physical examination of Morello on January 25, 2011. Yee Decl. Ex. L, p. 20 (Soong depo., 9:4-9). Dr. Soong estimates that he has seen between 100 and 1,000 quadriplegic patients. Cohen Opp. Decl. Ex. X (Soong arbitration depo. 21:1-25). In the 17-page Independent Medical Examination of Morello that Dr. Soong provided to AMCO on January 26, 2011, he concluded that "[f]urther medical treatment after three months would be attributed to [Morello's] preexisting spinal cord injury and would not be related to a rib fracture injury or soft tissue injury from this motor vehicle accident." Yee Decl. Ex. L, pp. 31, 47. (Soong Depo. Ex. 2). Dr. Soong opined that Morello "has recovered from the effects of the motor vehicle accident to reach his baseline status and no additional permanent disability was found by me from the motor vehicle accident." *Id.* at Ex. L, p. 47. He found that that there was no evidence that Morello had suffered any brain injury. *Id.* at Ex. L, p. 46.

Milone sent Simoncini & Associates a letter on March 10, 2011 stating that AMCO needed additional documentation to support Morello's earnings claim and the Medicare lien amounts. Cohen Decl. Ex. J, p. 206 (Milone Depo. Ex. 26). She wrote, "Once we have received this information, we will be able to finalize our review and move forward with settlement." *Id.*

Simoncini & Associates responded with a fax on March 28, 2011, renewing Morello's policy limits demand of $500,000. Cohen Decl. Ex. J, p. 209 (Milone Depo. Ex. 27). *Id*. Simoncini & Associates also suggested Craig Needham as a mediator.[1] *Id*. AMCO agreed to the mediation, but also noted that Morello's file would be transferred to AMCO's litigation department for arbitration. Coke Decl. Ex S (McDonald Depo. Ex. 44). Mediation was conducted on September 7, 2011. It was not successful.

Following the mediation, the parties conducted discovery in advance of the arbitration, which was set for September 6, 2012. Yee Decl. ¶¶ 4, 6-9. AMCO retained neurologist Dr. Mark Strassberg to conduct a review of Morello's neurological records and issue a report, which he completed on August 31, 2012. Yee Decl. ¶ 9 and Ex. M. Dr. Strassberg concluded that Morello "sustained a number of injuries including a concussion. He experienced complete recovery from that concussion over time." Yee Decl. Ex. M. p. 52. Dr. Strassberg also stated, "I do not believe that this patient, based on the records, requires any ongoing treatment in regard to his concussion." *Id*.

Morello provided three expert reports to AMCO between August 31, 2012 and September 4, 2012, in the week before the arbitration.[2] Yee Decl. ¶ 11, Exs. O, P, Q. Dr. Dawn Osterweil opined that the accident caused Morello mild traumatic brain injury and post-traumatic stress disorder. Yee Decl. Ex. O. Dr. Barchuk concluded that the accident caused Morello to suffer chronic lower back pain, exacerbated right hip pain, sleep disturbance, chronic fatigue and depression. Yee Decl. Ex. P. Carol Hyland, a rehabilitation consultant, concluded that the accident caused Morello's future care to increase $61,260 a year. Yee Decl. Ex. Q.

The parties arbitrated Morello's claim on September 6, 2012. On September 28, 2012, the arbitrator issued his findings in favor of Morello. The arbitrator found $2,083,879.40 in damages, but awarded Morello the policy limit of $485,000 ($500,000 limit minus $15,000 Morello

---

[1] Simoncini & Associates also stated that Morello was not making a claim for loss of earnings and that Morello would be responsible for the Medicare lien.

[2] On August 29, 2012, AMCO submitted a $50,000 settlement offer to Morello. Yee Decl. ¶ 10. It was not accepted.

received from the driver). Yee Decl. ¶ 12. AMCO paid Morello $485,000 on October 19, 2012. Yee Decl. ¶ 13.

## II. MORELLO'S CAUSES OF ACTION AND THE PARTIES' CROSS-MOTIONS

Morello alleges six causes of action: (i) breach of contract, (ii) breach of the covenant of good faith and fair dealing, (iii) intentional infliction of emotional distress, (iv) negligent infliction of emotional distress, (v) unfair business practices under the California Unfair Competition Law, and (vi) discrimination in violation of the Unruh Act. Dkt. No. 107 (First Amended Complaint). AMCO moves for summary judgment on all of Morello's causes of actions.[3] Dkt. No. 101. Morello seeks partial summary judgment only as to his claim for breach of the implied covenant of good faith and fair dealing. Dkt. No. 102. Oral argument occurred on May 21, 2014.[4]

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at

---

[3] AMCO also seeks summary judgment that Morello is not entitled to punitive damages in the event that one or more of his causes of action withstand summary judgment. Because I grant AMCO's motion for summary judgment, the punitive damages question is moot.

[4] The parties submitted a joint statement regarding a discovery dispute to Magistrate Judge Spero on April 4, 2014, after briefing on their motions for summary judgment was complete. Dkt. No. 97. The parties apparently resolved the dispute among themselves. *See* Dkt. No. 117. Neither party mentioned any issue related to the dispute in their summary judgment briefing or at the oral argument, and no one sought a continuance under Federal Rule of Civil Procedure 56(d). *See* Fed. R. Civ. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."). Nonetheless, on May 29, 2014, eight days after oral argument on the parties' motions for summary judgment, Morello filed a letter with Judge Spero stating that AMCO had agreed to provide it with eight categories of documents, discovery responses, stipulations, and statements. Dkt. No. 128. If Morello's opposition to AMCO's motion for summary judgment was constrained by AMCO's failure to produce these documents, he should have raised the issue under Rule 56(d). He did not so. He waited more than a week after the motions were argued and I had indicated, on the record, my expectation that I would grant AMCO's motion and deny Morello's motion. Morello's letter is untimely, is not relevant to my determination here, and does not warrant delaying this Order.

trial. The moving party need only demonstrate to the court "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "designate specific facts showing a genuine issue for trial." *Id*. at 324 (quotation marks omitted). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id*. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id*. However, conclusory or speculative testimony in affidavits is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

**I. BREACH OF CONTRACT**

Morello's complaint alleges that AMCO "refused to honor the contract of insurance by failing to pay any sum for damages related to the subject motor vehicle accident." FAC ¶ 44. This claim fails. It is undisputed that AMCO paid the $485,000 awarded to Morello by the arbitrator. Yee Decl. ¶ 13; Coke Decl. ¶ 33. AMCO's refusal to pay until it was ordered to do so by the arbitrator does not constitute a breach of the insurance contract. *See, e.g., Holenda v. Infinity Select Ins. Co.*, 2014 WL 559381, *3 (C.D. Cal. Feb. 13, 2014) ("Because Infinity paid the full amount of the arbitration award and the UM policy limit, it cannot be liable for breach of contract."); *Blodgett v. Allstate Ins. Co.*, 2012 WL 2377031, *4 (E.D. Cal. June 22, 2012) (dismissing breach of contract claim where insurer paid in full amount awarded to insured by

8

1  mediator after insured and insurer disputed amount of damages). [5]

## II. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

### A. Applicable law

The implied covenant of good faith and fair dealing "is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 36 (1995) (citation omitted). "[W]hen benefits are due an insured, delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because they frustrate the insured's right to receive the benefits of the contract in "prompt compensation for losses." *Id.* (internal citations and punctuation omitted). The "ultimate test" of liability for breach of the implied covenant is "whether the refusal to pay policy benefits was unreasonable." *Morris v. Paul Revere Life Ins. Co.*, 109 Cal. App. 4th 966, 973 (2003) (internal citations omitted); *see also Rappaport-Scott v. Interinsurance Exch. of Auto. Club*, 146 Cal. App. 4th 831, 837 (2007) ("An insurer that unreasonably delays, or fails to pay, benefits due under the policy may be held liable in tort for breach of the implied covenant.").

"[T]he implied covenant of good faith and fair dealing obligates the insurer to make a thorough investigation of the insured's claim for benefits." *Major v. W. Home Ins. Co.*, 169 Cal. App. 4th 1197, 1209-10 (2009); *see also Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 819 (1979) ("[A]n insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial."). An insurance company's duty to conduct a thorough investigation includes searching for evidence which supports its insured's claim.

---

[5] In his opposition brief, Morello appears to conflate his causes of action for breach of contract and breach of the implied covenant. He argues that AMCO cannot establish that it did not breach Morello's insurance policy because AMCO "does not take into account that implied in every contract is a covenant of good faith and fair dealing." AMCO Opp. at 9; *see also id*. at 10 ("AMCO breached the contract by violating that covenant by not negotiating in good faith, failing to conduct a complete investigation of his claim and failing to respond to policy demands among other issues."). The alleged breach of the implied covenant is addressed below.

*Mariscal v. Old Republic Life Ins. Co.*, 42 Cal. App. 4th 1617, 1624 (1996) ("An insurance company may not ignore evidence which supports coverage. If it does so, it acts unreasonably towards its insured and breaches the covenant of good faith and fair dealing."); *see also id.* at 1620 ("If it seeks to discover only the evidence that defeats the claim it holds its own interest above that of its insured.").

In *Mariscal*, an insurance company denied benefits on the grounds that its insured, Mariscal, died from a heart attack. The court held that the insurance did not conduct a reasonable investigation because the information available to it, including a hospital discharge summary and the death certificate, showed that Mariscal died from head injuries he suffered in an automobile accident and "strongly" suggested that he did not suffer a heart attack before the accident. *Id*. at 1624-25.

*Mariscal* should not be read to imply that all insurance company decisions must be correct. If an insurance company withholds policy benefits that it is ultimately required to pay, that in itself does not mean it breached the implied covenant of good faith and fair dealing. *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.,* 90 Cal.App.4th 335, 346-47 (2001). The implied covenant requires insurers to be reasonable, not flawless or prescient. *Id*. "Before an insurer can be found to have acted tortiously, i.e., in bad faith, in refusing to bestow policy benefits, it must have done so 'without proper cause.'" *Morris*, 109 Cal. App. 4th at 973 (internal punctuation and citations omitted).

"Withholding benefits due under the policy is not unreasonable if there was a genuine dispute between the insurer and the insured as to coverage or the amount of payment due." *Rappaport-Scott*, 146 Cal. App. 4th at 837. However, "the genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds." *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 723 (2007).

**B. Morello's allegations**

Morello argues that AMCO violated its implied duties because it determined, without reasonable investigation, that the accident did not require future medical care for Morello apart

10

from what Morello already required as a result of his pre-existing quadriplegia. Specifically, Morello contends that AMCO:

- Failed to interview Morello until his deposition in November 2011;

- Did not depose Morello's doctors, caregivers, or experts;

- Determined that it would not award Morello future medical care without consulting with any healthcare provider and did not consult a pain management doctor or rehabilitation doctor experienced in working with quadriplegics;

- Did not take any steps to determine what difference there was with Morello before or after the subject accident, including not determining Morello's ASIA Impairment Scale (classification of the severity of his spinal cord injury), as recommended by CMS Sharon Powell;

- Did not provide Dr. Soong, the only doctor that examined Morello in person, with all of Morello's records;

- Did not retain a neurologist/psychiatrist, Dr. Mark Strassberg, until soon before arbitration, and only to provide an opinion "as to whether or not Morello suffered a concussion in the accident;"

- Did not respond to policy limits demand of March 4, 2010.

Morello submitted two expert reports critical of AMCO's handling of Morello's claim. Thomas Corridan, who has 47 years of experience valuing and assessing underinsured motorist claims as an insurance adjuster and, since 1997, as an expert witness, states, in part, that:

> AMCO unreasonably failed to recognize that its claim staff from the initial adjuster up to its top Claim Directors did not have the necessary training or experience in the handling of a claims [sic] with issues of pre-accident and post-accident medical and psychiatric conditions of a quadriplegic. Unfortunately, this void did not alert them to the proper medical consultants and advisors. An expert dealing with life requirements of quadriplegics should have been retained to evaluate any difference in Morello's daily medical condition, his ambulatory abilities and his mental status.
>
> Statements from family members, business associates, care providers should have been obtained. The treating doctors should have been interviewed or deposed; they were not.
>
> (…)
>
> A medical assessment of the mental status was warranted. This should have included a detailed history from the patient, a complete record review and testing.

11

> (…)
>
> AMCO has failed to reasonably and properly manage the UIM claim of Mr. Morello. They undervalued the claim as a result of failing to conduct a reasonable and timely investigation of the claim. They failed to even offer an undisputed sum for settlement. They passively handled the claim resulting in needless delays for the final resolve.

Coke Decl. Ex. OO, pp. 8-9.

Similarly, Guy Kornblum, offered as an expert on bad faith insurance claims, states that:

> AMCO clearly was undervaluing the claim, and was relying almost exclusively on what "its" medical reviews stated, ignoring the medical records and reports of Mr. Morel's [sic] own treating physicians.
>
> In focusing on the reports of the physicians it chose to review this matter, and disregarding the records and reports of Mr. Morello's physicians, AMCO elevated its interests above those of its insured, which is a violation of the good faith claims principle which calls for the insurer to give "equal consideration" to the interests of its insured.
>
> Mr. Morello was clearly a vulnerable plaintiff i.e. 'the eggshell plaintiff.' Claims persons are—or should be—familiar with this concept of evaluation of an injury claim, and should have included it, or at least referenced it, in connection with its evaluation. It appears the concept was not considered, ignored or downplayed.

Coke Decl. Ex. RR, p. 23.

### C. Analysis

AMCO did not violate the implied covenant. It conducted a reasonable investigation and did not delay unreasonably.[6] AMCO's and Morello's disparate valuations of Morello's loss reflected a genuine dispute. AMCO's position was maintained on reasonable grounds and was supported by the opinions of three medical professionals, all of whom have experience with quadriplegic patients.

---

[6] AMCO argues that its duty to investigate did not arise until October 21, 2009, when Morello's attorney sent AMCO the executed settlement agreement in the underlying action against Sandorff, the driver. AMCO Mot. at 12. At oral argument, counsel for Morello suggested that the relevant time period—the period in which AMCO allegedly violated the implied covenant of good faith—was not until later. Regardless of when AMCO's implied duties were triggered, Morello has not presented evidence from which a jury could reasonably conclude that AMCO handled Morello's claim unreasonably.

AMCO repeatedly requested Morello's medical records and attempted to interview Morello beginning in April 2008, only days after it was first notified of the accident. *See supra* pp. 2-3. Morello did not provide the requested medical authorizations until July 1, 2010, over two years later. Cohen Decl. Ex. E p. 82 (Baumann Depo. Ex. 16). Morello never scheduled the interview, despite repeated requests and his lawyer's initial offer that he do so. *See, e.g.,* Cohen Decl. Ex. G (Drakulich Depo. Ex. 29) (Weng letter stating "I have been calling on several occasions requesting a copy of the designation letter along with scheduling a time to meet with your client George Morello Jr. and yourself."). At oral argument, counsel for Morello argued that AMCO was not "prejudiced" by Morello's failure to respond to AMCO's requests for his interview or to provide his medical records earlier. That is not the point. Morello has accused AMCO of failing to conduct a reasonable investigation into his claims, including by not interviewing him prior to his deposition. The question is whether AMCO's investigation was reasonable in light of all the circumstances, and the circumstances include Morello's failure to respond to AMCO's requests for his interview, his long delay in providing the medical authorizations, and his provision of the three expert opinions that supported his position regarding future medical expenses just days before the arbitration.

AMCO first issued a demand to AMCO on March 4, 2010. Cohen Decl. Ex. E, p. 61 (Baumann Depo. Ex. 11). Morello demanded the policy limits of $500,000 plus $5,000 medical pay, including $209,000 to $297,000 in future medical expenses.[7] Within fifteen days, claims representative Baumann and Claims Medical Specialist Powell, a registered nurse with prior experience with quadriplegic patients, had reviewed Morello's claim. Coke Decl. Ex. I, pp.177-180 (Powell Depo. Ex. 3). Powell concluded that Morello "would have needed the same care he

---

[7] AMCO ultimately offered $50,000 to Morello just prior to the arbitration. In light of Morello's delay in providing medical authorizations and the reports from his physicians and experts, and the medical reports AMCO obtained that indicated Morello would not have future medical expenses arising from the accident, the timing of AMCO's offer was not unreasonable.

had prior to this loss with or without it." *Id*. at Ex. I p. 179.[8]

On October 21, 2010, six weeks after AMCO finally received Morello's medical records, AMCO attempted to schedule Morello's independent medical examination.[9] Cohen Decl. Ex. E, p. 88 (Baumann Depo. Ex. 17). In light of Morello's delay and AMCO's need to analyze the medical records it received, six weeks was not an unreasonable delay. Then Morello failed to respond to AMCO's request for a date for the independent medical examination for over a month. Cohen Decl. Ex. J, p. 202 (Milone Depo. Ex. 19). Dr. Soong examined Morello on January 25, 2011 and provided his Independent Medical Examination to AMCO the next day. Yee Decl. Ex. L p. 31 (Soong Depo. Ex. 2).

Dr. Soong's report details the medical records he reviewed, including records from Dr. Catherine Dobbins, Morello's primary physician before the accident. *See, e.g.,* Yee Decl. Ex. L pp. 41-43. (Soong Depo. Ex. 2).[10] Morello alleges that "AMCO selectively provided Dr. Soong with Morello's medical records, and failed to provide him with pre-accident records which would have demonstrated Morello's functioning pre-accident" and that "[a] reasonable inference from this is that AMCO directed Dr. Soong's examination and ultimate conclusions in order to fit their predetermined strategy created in March, 2010 for handling this case." AMCO Opp. at 17. But Dr. Soong reviewed extensive pre-accident records regarding Morello's quadriplegia. Yee Decl. Exh. L, ¶. 36, 41-44 (Soong depo. Ex. 2). Morello does not identify any specific medical record

---

[8] Powell stated that it would be "important" to know Morello's Asia Impairment Scale (classification of severity of Morello's spinal cord injuries). *Id*. Morello claims that AMCO did not follow up on this recommendation. But all the doctors who evaluated Morello were well aware of his quadriplegia and gave opinions on its severity. Morello's complaint is unfounded.

[9] AMCO received the medical records authorization on July 1, 2010. Cohen Decl. Ex. E p. 82 (Baumann Depo. Ex. 16). AMCO requested Morello's medical records the same day. Baumann Depo. 182:3-17; Anderson Decl. ¶ 7, Exs. C, D. AMCO had received responses from Morello's medical providers by September 8, 2010. Baumann Depo. 188:3-6; Anderson Decl. ¶ 7. On October 21, 2010, AMCO asked Morello for possible dates for the medical examination. Cohen Decl. Ex. E, p. 88 (Baumann Depo. Ex. 17).

[10] Morello contends that AMCO provided specific instructions to Dr. Soong which Dr. Soong "destroyed." But Dr. Soong testified that he does not retain any records after a review. There is no evidence that Dr. Soong received special instructions from AMCO.

14

1    that AMCO supposedly withheld from Dr. Soong.

2    Following the parties' unsuccessful mediation, AMCO retained neurologist Dr. Mark
3    Strassberg to conduct a review of Morello's neurological records and issue a report.  Yee Decl. ¶
4    9.  Unlike Dr. Soong, Dr. Strassberg concluded that Morello suffered a concussion.  Yee Decl. Ex
5    M. p. 52.  But like Dr. Soong, Dr. Strassberg concluded that Morello did not require any ongoing
6    treatment arising from the accident. *Id*.

7    Between August 31, 2012 and September 4, 2012, four and a half years after the accident
8    and just days before the September 6, 2012 arbitration, Morello provided three expert reports to
9    AMCO.  Yee Decl. ¶ 11, Exs. O, P, Q.  Morello faults for AMCO for not deposing these experts.
10   Given the last minute submission of these reports, AMCO's failure to depose them was not
11   unreasonable.  At oral argument, counsel for Morello argued that AMCO should have deposed the
12   experts before their reports were served because Morello disclosed the experts in expert discovery
13   on July 23, 2012.  Morello cites no authority that failure to depose disclosed experts who have not
14   issued reports constitutes bad faith.  Morello had more than ample time to submit his experts'
15   reports to AMCO at an earlier time in support of his claim and in order to resolve his claim
16   without arbitration. Under these circumstances, a jury could not reasonably find that AMCO's
17   failure to depose the experts was unreasonable.

18   Much of Morello's argument relies on his assertion that AMCO, through Baumann,
19   decided at the outset that Morello was not entitled to future medical costs because he was already
20   a quadriplegic before the accident.  However, as detailed above, AMCO's determination that
21   Morello did not require future care was not based on Baumann's initial assessment.  Rather,
22   AMCO conducted an investigation involving review of Morello's available medical records and a
23   physical examination of Morello.  Three medical professionals concluded that Morello did not
24   require future medical care related to the accident.  For the reasons stated, Morello has not offered
25   evidence from which a jury could reasonably conclude that AMCO handled Morello's claim
26   unreasonably.  Morello's claim for breach of the implied covenant fails.

27   **III. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

28   Morello contends that he can recover for emotional distress without showing that AMCO's

15

conduct was "outrageous" or "severe." Morello Opp. at 19. In support, Morello cites the California Supreme Court's statement that "we did not suggest that to warrant recovery for mental distress the conduct of the insured must be 'outrageous' or that the mental distress must be 'severe.'" *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 579 (1973). Morello conflates two distinct concepts involving emotional distress: (i) recovery for emotional distress where a party is liable for tortious conduct and (ii) the elements of a cause of action for infliction of emotional distress. The statement in *Gruenberg* cited by Morello was explicitly related to emotional distress as an element of damages, not to the cause of action for infliction of emotional distress. *Id*. at 580 (distinguishing "those cases in which emotional distress may be an element of damages where other interests have been invaded, and tort liability has arisen apart from the emotional distress" from "the independent tort of intentional infliction of emotional distress"). Recovery for emotional distress as an element of damages may not necessarily require conduct that is "outrageous" or "severe"; the cause of action for intentional infliction of emotional distress does. *Id.* Morello's complaint alleges intentional infliction of emotional distress. He must therefore present evidence from which a jury could conclude that AMCO's conduct was "outrageous" or "severe."

Morello also argues that "a trier of fact could determine that AMCO's handling of this claim, which necessarily involved using Morello's pre-existing disability against him, was extreme and outrageous." Morello Opp. at 20. He contends:

> Mr. Baumann decided at the very outset of this claim that because MORELLO was a quadriplegic, that any future care would be related to his pre-existing condition and not the motor vehicle accident. It was AMCO's way of discounting this claim and forcing MORELLO to jump through hoops to prove his claim. That is not acceptable claims handling, and a trier of fact will likely find that it was despicable.

*Id*.

Morello's theory is unsupported by evidence. Baumann's initial determination that Morello's future medical needs were not related to his pre-existing quadriplegia was not determinative of AMCO's position. AMCO asked Claims Medical Specialist Sharon Powell, a

16

registered nurse with prior experience with quadriplegic patients and patients with spinal injuries, to review Morello's file. Cohen Decl. Ex. I, pp.177-180 (Powell Depo. Ex. 3). Baumann specifically asked Powell to address Morello's pre-existing quadriplegia and whether Morello would require the future care that he claimed. *Id*. at Ex. I, p. 177. AMCO then retained Dr. Soong to review Morello's medical records and conduct a physical examination of Morello. Dr. Soong had treated between 100 and 1,000 quadriplegic patients. Cohen Opp. Decl. Ex. X (Soong depo. 21:1-25). AMCO also retained neurologist Dr. Mark Strassberg to conduct a review of Morello's neurological records and issue a report. Yee Decl. ¶ 9. As noted above, Powell and Doctors Soong and Strassberg, three medical professionals with experience with quadriplegics, each concluded that Morello did not require future medical care as a result of the accident beyond what he had already received by the time of their reports. While Morello may feel that AMCO undervalued his future medical needs necessitated by the accident, he has not presented evidence from which a jury could reasonably conclude that AMCO's conduct was extreme or outrageous. His claim for intentional infliction of emotional distress fails.

### IV. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

AMCO argues that there is no independent tort of negligent infliction of emotional distress in California and "negligence is not among the theories of recovery generally available against insurers." AMCO Mot. at 20. Morello does not respond to these arguments. AMCO is correct. *See Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 984, 863 P.2d 795, 807 (1993) ("there is no independent tort of negligent infliction of emotional distress"); *Sanchez v. Lindsey Morden Claims Servs., Inc.*, 72 Cal. App. 4th 249, 254 (1999) ("negligence is not among the theories of recovery generally available against insurers"). Morello's claim for negligent infliction of emotional distress fails.

### V. VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

The California Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Each of these three adjectives captures a separate and distinct theory of liability." *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (quotation marks omitted). The "unlawful" prong of the UCL

"borrows violations of other laws and treats them as independently actionable." *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 837 (2006). Some courts have held that the "unfair" prong requires a practice that "offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," and that the policy must be "tethered to specific constitutional, statutory or regulatory provisions." *Bardin v. Daimlerchrysler* Corp., 39 Cal. Rptr. 3d 634, 642, 645 (Ct. App. 2006) (quotations omitted). Other courts have held that the court must apply a balancing test that "weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Schnall v. Hertz Corp.*, 93 Cal. Rptr. 2d 439, 456 (Ct. App. 2000). A claim under the "fraudulent" prong of the UCL requires "a showing that members of the public are likely to be deceived." *Id*. at 457.

The California Supreme Court has stated that

> bad faith insurance practices may qualify as any of the three statutory forms of unfair competition. They are *unlawful;* the insurer's obligation to act fairly and in good faith to meet its contractual responsibilities is imposed by the common law, as well as by statute. They are *unfair* to the insured; unfairness lies at the heart of a bad faith cause of action. They may also qualify as *fraudulent* business practices. Under the UCL, it is necessary only to show that the plaintiff was likely to be deceived, and suffered economic injury as a result of the deception.

*Yanting Zhang v. Superior Court*, 57 Cal. 4th 364, 380 (2013) (citations omitted).

Morello argues that "[t]he very fact that Morello has demonstrated that AMCO did not act reasonably in the handling of this claim . . . is sufficient to defeat the motion on this cause of action." Morello Opp. at 21. However, as noted above, Morello has not presented evidence from which a jury could reasonably conclude that AMCO did not handle his claim reasonably. Morello's claim fails under all three prongs of the UCL. The unlawful prong fails because Morello's bad faith, contract, discrimination and emotional distress claims fail, leaving him with no unlawful conduct to tether his UCL claim to. The unfair prong fails because, for the reasons stated above, there is no evidence from which a jury could reasonably conclude that AMCO's conduct violated public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, or that the gravity of the harm to Morello outweighed the utility AMCO's conduct. The fraudulent prong fails as Morello has introduced no evidence that members of the

18

public are likely to be deceived by AMCO's conduct.

## VI. DISCRIMINATION IN VIOLATION OF THE UNRUH ACT

Morello argues that "Mr. Baumann's denial of future care without any investigation" creates a triable issue regarding whether "AMCO took advantage of Morello's disability to avoid paying the claim." Morello Opp. at 21-22. But, as noted, Baumann's initial determination was only the beginning of AMCO's investigation: it retained three medical experts with experience with quadriplegics to evaluate Morello's claim. There is no evidence from which a jury could reasonably conclude that AMCO discriminated against Morello.[11] Morello's Unruh Act claim fails.

## CONCLUSION

AMCO's motion for summary judgment is GRANTED. Morello's motion for partial summary judgment is DENIED.[12] The trial set for August 11, 2014 and all related deadlines are VACATED. Judgment shall be entered accordingly.

**IT IS SO ORDERED**.

Dated: May 29, 2014



WILLIAM H. ORRICK

United States District Judge

---

[11] Morello provides no authority that the Unruh Act, or any other law, requires AMCO to ignore Morello's pre-existing quadriplegia when evaluating future medical needs necessitated by the accident.

[12] Following oral argument, Morello filed a request that I "state the findings of fact and conclusions of law" in the order that I issue. Dkt. No. 120. Morello's request reflects a state court practice following trials of a question of fact by the court. *See* Cal. Code Civ. Pro. § 632. There is no such practice in federal court, certainly not on a motion for summary judgment, as Federal Rule of Civil Procedure 56(a) already requires the Court to "state on the record the reasons for granting or denying the motion," as this order does. The request is DENIED.